**INDIANA VOLUNTARY FIREMEN'S ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Linley E. PEARSON, Attorney General of the State of Indiana, Defendant.**

**No. IP 87–1052–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 29, 1988.

Bryce H. Bennett, Jr., G. Frederick Glass, Riley, Bennett & Egloff, Indianapolis, Ind., Errol Copilevitz, John P. Jennings, Jr., Copilevitz, Bryant, Gray & Jennings, Kansas City, Mo., for plaintiffs.

David M. Sommers and Christine M. Page, Deputy Attys. Gen., Indianapolis, Ind., for defendant.

BARKER, District Judge.

## CONTENTS

I.  Background ........................................................ 424
II.  Analysis ......................................................... 426
    A.  Preliminary Issues .............................................. 426
        1.  Ripeness ..................................................... 426
        2.  Standing ..................................................... 427
            a.  The Plaintiff Percy M. Armstrong ........................... 429
            b.  The Plaintiffs Indiana Volunteer Firemen's Association and Professional Firefighters' Union of Indiana ................. 430
            c.  The Plaintiff Daniel L. Yuska ................................ 430
        3.  Eleventh Amendment Immunity and Abstention ................... 431

B. The Merits of the Plaintiffs' Claims .................................. 433
    1. Overbreadth: Indiana Code § 23–7–8–1's Application to Non–Charities ...................................................... 433
    2. Overbreadth: Indiana Code § 23–7–8–6's Alleged Facial Violation of the First Amendment ....................................... 435
        a. Recent Supreme Court Precedent ........................... 435
        b. Threshold Inquiry: Does the Statute Impact Upon Activities Fully Protected by the First Amendment? .................... 437
        c. Secondary Inquiry: Is the Statute the Least Restrictive Means of Promoting a Substantial State Interest? ................. 438
          i. The State Interest ...................................... 439
          ii. The Tailoring of the Statutory Provisions ................ 440
            (a) Indiana Code § 23–7–8–6(a)(1) & (2) .................... 441
            (b) Indiana Code § 23–7–8–6(a)(3) ........................ 442
            (c) Indiana Code § 23–7–8–6(b) ........................... 444
            (d) Indiana Code § 23–7–8–6(c) ........................... 447
    3. Severability ................................................. 448
III. Conclusion ........................................................ 448

## ENTRY

This case presents a fundamental question concerning the scope of protection afforded by the first amendment's right of free speech. More specifically, this court is asked to determine whether an Indiana statute requiring professional fundraising solicitors to divulge to potential donors certain details about the financial arrangements between themselves as professional solicitors and their represented charities is unconstitutionally overbroad under the first amendment to the United States Constitution.

## I. *Background*

On April 16, 1987, the 105th General Assembly of the State of Indiana enacted Senate Enrolled Act Number 484, an act designed to amend certain provisions of the Professional Fundraiser Consultant and Solicitor Registration Statute [the Statute], Indiana Code Ann. §§ 23–7–8–1 to –8 (Burns 1984). The amendments effected by the Act took force on September 1, 1987. See Ind.Code § 1–1–3–3. As amended, the Statute imposes a number of restrictions on the activities of professional fundraiser consultants and professional solicitors [hereinafter referred to collectively as "professional solicitors"] whenever those professionals desire to work on be-

half of charitable organizations. For instance, under the statute professional solicitors are required to register annually with the consumer protection division of the office of the state attorney general. Ind. Code § 23–7–8–2. As part of that registration, the Statute requires that professional solicitors reveal such details as the "names and addresses of all officers, employees, and agents who are actively involved in fundraising" and "the name or names under which [they] intend[ ] to solicit contributions." Ind.Code § 23–7–8–2(a)(1) to –(5). The amended Statute also demands that professional solicitors enter into only written contracts with charitable organizations and that copies of those contracts be filed with the consumer protection division along with "[t]he projected dates when soliciting will begin and end" and "[t]he location and telephone number from where solicitation will be conducted." Ind.Code § 23–7–8–2(d) & (e).

Two particular sections of the Statute, however, are directly relevant to the present litigation. Indiana Code section 23–7–8–1 sets out the definitions of a number of terms used throughout the Statute. Specifically, "charitable organization" is defined as "any organization described in section 501 of the Federal Internal Reve-

nue Code," and "professional solicitor" is defined as expressly excluding from its scope "a charitable organization or an officer, employee, member, or volunteer of a charitable organization." Ind.Code § 23–7–8–1. This same section also sets up a two-tiered definition for the statutory term "solicit." One form of solicitation is described as the sale of "any advertisment, advertising space, membership, or tangible item . . . when or where in connection with [such] a sale . . . any statement is made that the whole or any part of the proceeds from the sale will be used for any charitable purpose or benefit any charitable organization." Ind.Code § 23–7–8–1(2) [hereinafter a "subdivision (2) solicitation"]. The second form of solicitation is defined as any other type of request, made "directly or indirectly, [for] financial assistance in any form on the representation that the financial assistance will be used for a charitable purpose." Ind.Code § 23–7–8–1(1) [hereinafter a "subdivision (1) soliciation"].

A second section of the Statute, Indiana Code section 23–7–8–6, in turn, sets out two different categories of disclosure requirements, one for each type of solicitation. If a professional solicitor conducts a subdivision (2) solicitation, he or she must provide each potential donor with a "written confirmation" disclosing three different items: the name of the charitable organization that the solicitor represents; the fact the solicitor is a compensated professional; and "the percentage of charitable contributions that are to be received by the charitable organization or the fee or compensation received by the consultant and the charitable organization under the contract with the charitable organization." Ind.Code § 23–7–8–6(c).

For subdivision (1) solicitations that are made orally, section 23–7–8–6 requires that these same three disclosures be made twice: "at the time of the solicitation and before the donor agrees to make a contribution" and a second time "within ten (10) days after that person has been solicited, or before the contribution is received by the solicitor." Ind.Code § 23–7–8–6(a) & (b). If the original solicitation is made in person, then both sets of disclosures must be made in writing. Ind.Code § 23–7–8–6(b). If the original solicitation is made by telephone, the first set of disclosures may be made orally but the second set must be made in writing. *Id.* If the original subdivision (1) solicitation is itself in writing, the three disclosures need be made only once, in writing, at the time of the solicitation. *Id.*

Indiana Code section 23–7–8–8 establishes three different remedies the state may seek in the event of a violation of the Statute. First, the attorney general may bring an action to enjoin a violation of the Statute—and to receive such injunctive relief, the state "is not required to establish irreparable harm but only a violation of a statute or that the requested order promotes the public interest." Ind.Code § 23–7–8–8(c). Second, for each violation of the Statute, the state may be awarded civil penalties of up to five hundred dollars ($500). *Id.* Third, and most significantly, any person who "knowingly or intentionally" fails to make the disclosures prescribed in section 23–7–8–6 thereby commits a Class A infraction, subjecting that person to a possible adverse judgment of up to ten thousand dollars ($10,000), plus costs. Ind. Code §§ 23–7–8–8(d); 34–4–32–4(a) & (e).

On October 1, 1987, the plaintiffs [1] filed the present cause of action against the defendant, Linley E. Pearson (in his official capacity as Attorney General of the State of Indiana), requesting preliminary and permanent injunctions against enforcement of Indiana Code sections 23–7–8–1 and 23–

---

1. There are in fact four named plaintiffs in this action: Indiana Volunteer Firemen's Association, Inc., a not-for-profit Indiana labor corporation; Professional Firefighter's Union of Indiana, Inc., a not-for-profit Indiana corporation; Percy M. Armstrong, a professional solicitor; and Daniel L. Yuska, an Indiana resident who wishes to receive charitable solicitations. Each plaintiff is discussed individually and in more detail, *infra*, at § II.A.2 ("Standing"). Otherwise, for the sake of convenience, the four plaintiffs will be referred to collectively as "the plaintiffs."

7–8–6[2] and seeking a declaration that those same sections of the Indiana Code "are unconstitutional, in whole or in part, and violative of the First, Fifth and Fourteenth Amendments to the Constitution of the United States." Complaint at 13–14. The request for a preliminary injunction was withdrawn by the plaintiffs on October 23, 1987. *See* Status Conference Report and Order at 2.

This matter is presently before the court on the defendant's motion to dismiss and on the parties' cross-motions for summary judgment. The defendant urges that the plaintiffs' complaint should be dismissed for at least four different reasons: (1) this case is not yet ripe for adjudication; (2) each of the plaintiffs lacks adequate standing to assert the claims set out in the complaint; (3) the defendant is forfended by eleventh amendment immunity; and (4) this federal court should abstain from rendering a decision on the plaintiffs' state constitutional claims until the Statute has been decisively interpreted by Indiana state courts. The plaintiffs controvert each of the defendant's arguments for dismissal and in turn posit three basic reasons why summary judgment should be entered in their favor: (1) Indiana Code section 23–7–8–1 effects an unconstitutional delegation of legislative authority under the Indiana Constitution; (2) Indiana Code section 23–7–8–1 is unconstitutionally overbroad under the federal Constitution; and (3) Indiana Code section 23–7–8–6 is a facial violation of the first amendment right to free speech. The defendant counters by arguing that the Statute is constitutional on its face and that, because there are no genuine issues of material fact needing to be resolved, he is entitled to summary judgment in his favor.

## II. *Analysis*

### A. Preliminary Issues

Because a finding that the plaintiffs' complaint should be dismissed would obviate the need for the court to address the difficult constitutional issues presented by the parties' cross motions for summary judgment, the court turns first to the defendant's motion to dismiss. As noted above the defendant's motion argues that the plaintiffs' complaint should be dismissed for at least four different reasons. The court will address each of the defendant's arguments separately.

### 1. *Ripeness*

The defendant's first contention is that the plaintiffs' complaint raises issues that are not yet ripe for adjudication. The defendant urges that, because the complaint alleges that "no criminal proceedings are currently pending under the referenced statutory scheme" and because "[t]he only allegations of future harm in the complaint relate to the generalized threat of future prosecution *if* certain plaintiffs *choose* to engage in prohibited acts," Brief in Support of Defendant's Motion to Dismiss at 3 (emphasis in the original), hearing this case at the present time would violate the ripeness doctrine and its "central concern" that cases not involve "uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 2 (quoting 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3532, at 112 (2d ed. 1984)). The plaintiffs counter by urging that "[r]ipeness is simply not an issue" in this case because "this is a facial overbreadth attack on a statute which allegedly impinges upon the first amendment rights of plaintiffs who admittedly fall within the definition of charitable organization embodied in the statute." Plaintiffs' Reply to Defendant's Motion to Dismiss at 2.

By arguing that in this case "[r]ipeness is simply not an issue" the plaintiffs overstate their case—but only slightly. Ripeness is, of course, a thresh-

---

**2.** The complaint actually seeks to enjoin enforcement of "Ind. Code 23–7–8–3." Because the Indiana Code contains no section "23–7–8–3," however, the court can only assume that this request by the plaintiffs is a misstatement of the true remedy they seek. Indeed, the subsequent pleadings by both the plaintiffs and the defendant make it abundantly clear that all parties understood that the plaintiffs really intended to attack the constitutionality of Indiana Code section 23–7–8–6, and the court will proceed with its analysis based on that understanding.

old issue in every case, particularly in cases, such as the one at bar, where the plaintiffs have not as yet been charged with violation of the challenged statute. *See, e.g., United Public Workers v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947); *but see Adler v. Board of Education*, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952). As this court has previously recognized, however, "to establish a 'case or controversy' under Article III of the Constitution, plaintiffs need not be the subjects of an administrative or judicial proceeding at the time the lawsuit is initiated." *American Booksellers Ass'n, Inc. v. Hudnut*, 598 F.Supp. 1316, 1329 (1984), *aff'd* 771 F.2d 323 (7th Cir.1985), *aff'd* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). This is especially true in the context of a first amendment "overbreadth" attack on a statute that is currently in force: if such a statute is alleged *presently* to be "chilling" protected expression, that allegation by definition meets the ripeness requirement that the "contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Association v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)). As the United States Supreme Court has stated in addressing justiciability requirements for first amendment cases in general, if one assumes a litigant has standing, he or she is "permitted to challenge a statute not because [his or her] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broaderick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), *quoted in Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984). Therefore, the court finds that the plaintiffs' allegation that the challenged Indiana Statute is currently and impermissibly chilling free speech presents a live controversy and the defendant's motion to dismiss on the basis of ripeness is accordingly denied.

### 2. *Standing*

A slightly more substantial procedural question is presented by the defendant's allegation that none of the plaintiffs has adequate standing to present the various claims set out in their complaint. As noted earlier by the court, there are four named plaintiffs in this cause of action: a professional solicitor who allegedly works in Indiana (Percy M. Armstrong); two not-for-profit Indiana corporations allegedly within the challenged statute's definition of "charitable organization" (Indiana Volunteer Firemen's Association, Inc., and Professional Firefighters' Union of Indiana, Inc.); and an Indiana resident who wishes to receive charitable solicitations (Daniel L. Yuska). The defendant argues that Mr. Armstrong lacks standing because he "does not allege that he has ever been told by the Defendant or his employees that he will be prosecuted because his acts do not comply with the statute." Brief in Support of Defendant's Motion to Dismiss at 4. The defendant argues that the two plaintiff charitable organizations lack standing because they "allege only a general reluctance to enter into contracts with professional solicitors because of a 'threat of prosecution for misdemeanor offenses.'" *Id.* Finally, the defendant argues that Mr. Yuska lacks standing because he alleges only an undifferentiated injury shared equally by all members of the public. *Id.* at 4–5. The plaintiffs counter by stating that "[w]hen a litigant challenges the facial validity of an allegedly overbroad statute constituting a prior restraint of protected speech, the traditional rules of standing are drastically relaxed," and by urging that, under these relaxed standards, all four plaintiffs have adequate standing to challenge the Statute. Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (incorporated by reference into Plaintiffs' Motion for Summary Judgment) [hereinafter "Plaintiffs' Memorandum in Support"] at 5–9.

Standing to assert an overbreadth challenge to a statute has traditionally been addressed as an issue of third-party standing wherein the central question is whether the named parties should be allowed to assert the constitutional rights of those not presently before the court.[3] The usual rule "is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court." *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3359, 73 L.Ed.2d 1113 (1982). For at least two reasons, however, the prudential aspects of this usual rule barring third-party assertion of constitutional claims are loosened somewhat in the context of overbreadth challenges to statutes: first, there is unlikely to be a *better* party to bring to judicial attention a statute's potential unconstitutional applications. "Those whose expression is 'chilled' by the existence of an overbroad or unduly vague statute cannot be expected to adjudicate their own rights, lacking by definition the willingness to disobey the law." L. Tribe, *American Constitutional Law* § 12–32 at 1035 (2d Ed.1988). See also M. Nimmer, *Freedom of Speech* § 4.11[A] at 4–148 to –149 (1984) (stating that the Supreme Court's overbreadth standing rules are a product of "[t]he fear ... that those who might wish to engage in speech protected by the First Amendment, upon learning that such speech is rendered unlawful by the overbroad provisions of a given statute, will not challenge the statute, but instead will be 'chilled' in their inclination to speak"); *Village of Schaumburg v. Citizens for A Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980) (stating that "[i]n these First Amendment contexts, the courts are inclined to disregard the normal rule against permitting one whose conduct may validly be prohibited to challenge the proscription as it applies to others because of the possibility that protected speech or associative activities may be inhibited by the overly broad reach of the statute"). Second (and as a direct corollary to the first justification for relaxed standing requirements in the overbreadth context), the Court has stated that "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, *but for the benefit of society*—to prevent the statute from chilling the First Amendment rights of others not before the court." *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 958, 104 S.Ct. 2839, 2846, 2847, 81 L.Ed.2d 786 (1984) (emphasis added) (also pointing out that "[e]ven where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged."). It is crucial to note, however, that overbreadth standing is "relaxed" in its prudential aspects only; plaintiffs must still make the constitutionally mandated showing of a "case or controversy."

■ Thus, the Court has stated that the critical issues for establishing overbreadth standing "are whether [the plaintiff] satisfies the requirement of injury-in-fact and whether it can be expected satisfactorily to frame the issues in the case." *Id.* at 958, 104 S.Ct. at 2847. In other words, for purposes of establishing overbreadth standing, the Court has essentially mandated a two-pronged showing: first, as a threshold matter, the plaintiff must demon-

---

**3.** Because the named plaintiff in an overbreadth challenge to a statute must *itself* meet the "injury-in-fact," "case-or-controversy" requirements of the Constitution, *see Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980); *Secretary of State of Maryland v. Joseph H. Mun-* *son Co.,* 467 U.S. 947, 949, 958, 104 S.Ct. 2839, 2843, 2847, 81 L.Ed.2d 786 (1984), it is at least open to question whether it is technically accurate to deal with expanded standing in such cases as truly being an issue of "third-party" standing at all. *See* L. Tribe, *American Constitutional Law* § 12–32 at 1037 (2d Ed.1988).

strate that it satisfies the minimal constitutional requirement of having a valid "case or controversy" by indicating that it has suffered an "injury-in-fact," [4] *see Schaumburg*, 444 U.S. at 634, 100 S.Ct. at 834 (finding that "given a case or controversy" plaintiffs whose own speech is unprotected may attack the constitutionality of an overbroad statute); second, having met this constitutional minimum, the plaintiff must make the prudential showing that it can present the first amendment issues to the court in a satisfactory manner. It is only this second requirement that is moderated for an overbreadth challenge to a statute. With this two-pronged analysis in mind, the court now turns to an assessment of the standing asserted by the individual plaintiffs.

### a. The Plaintiff Percy M. Armstrong

■ The plaintiff Percy Armstrong has submitted an affidavit to this court in which he alleges that he is a resident of Indiana who has worked over the past three years for various charitable organizations as a professional solicitor. He further alleges that "enforcement of the [challenged] statutes will make it difficult, if not impossible, to raise funds for such groups"

and that "[i]f the statutes are enforced ... then I will either have to leave my profession or move from the state of Indiana." Plaintiff's Reply to Defendant's Cross Motion for Summary Judgment [Plaintiff's Reply], Exhibit D. The defendant does not challenge Mr. Armstrong's factual allegations; he simply points out that Mr. Armstrong does not allege that he has been told by the defendant that he will be prosecuted for his failure to comply with the Statute. Brief in Support of Defendant's Motion to Dismiss at 4.

Because he falls squarely within the scope of the challenged Statute and because he is subject to a sanction if he fails to comply with the Statute,[5] Mr. Armstrong's complaint clearly presents a valid "case or controversy." The defendant's argument that the defendant has not been threatened with prosecution raises a question of "ripeness," not of standing, and as such has already been addressed by the court. *See* § II.A.1., *supra*. Furthermore, the court finds that because Mr. Armstrong has a personal interest in seeing the challenged Statute struck down, he is well-positioned "satisfactorily to frame" the overbreadth issue for the court on behalf of those parties whose conduct is allegedly

---

**4.** In light of the fact that the expansive aspects of overbreadth standing mean that the named plaintiffs will be attacking the constitutionality of a statute that, by definition, *could not* violate their own constitutional rights, it is difficult to discern just what "injury-in-fact" might exist for such plaintiffs. The best answer comes from those commentators who suggest that "when the court is asked to strike a law on its face as being overbroad, the individual is asserting that *no one* in our society—including persons whose speech is unprotected by the First Amendment—can be subjected to punishment under a statute so sweeping that it could include both protected and unprotected speech within its scope." R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 20.8 at 30 (emphasis added). Thus, it would appear that, at a minimum, in order to meet the constitutional case-or-controversy requirement, a plaintiff alleging overbreadth standing must show that he or she is potentially within the applicable scope of the challenged statute—or, at the very least, that the statute's enforcement could potentially have a direct and substantial impact on such plaintiff's activities.

**5.** The defendant apparently believes that it is constitutionally significant that the potential fines that could be imposed under the Statute are relatively small. The defendant urges that "a violation of the statute is a Class A infraction and is enforced in a *civil* suit, not a criminal one. An 'infraction' is separate and distinct from a 'misdemeanor' ...; the latter is criminal in nature and carries a heavier penalty than an infraction violation." Brief in Support of Defendant's Motion to Dismiss at 4. This line of argument, however, lacks merit. As long as a statute imposes a fine substantial enough to potentially deter conduct—and the Indiana Statute's potential imposition of $10,000 in penalties for a Class A infraction undoubtedly has the potential to deter conduct—it is subject to an overbreadth attack. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 n. 19, 104 S.Ct. 2118, 2126 n. 19, 80 L.Ed.2d 772 (1984) (noting that "where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack").

chilled by the Statute.[6]  Therefore, the defendant's motion to dismiss Mr. Armstrong's complaint for lack of standing is denied.

**b.  *The Plaintiffs Indiana Volunteer Firemen's Association And Professional Firefighters' Union of Indiana***

■ The plaintiffs Indiana Volunteer Firemen's Association and Professional Firefighters' Union of Indiana are two not-for-profit Indiana corporations which allegedly fall within the scope of the Statute's definition of "charitable organization." For increased public awareness and for funds, both organizations rely heavily on the services of a professional publisher whose solicitations on behalf of the organizations would allegedly fall within the disclosure requirements of the Statute. Both organizations contend that, because of the Statute, their current publisher will be unable to continue its services to the organizations and that contracts with other publishers will be difficult to obtain. *See* Plaintiffs' Reply, Exhibits B & C. The defendant urges that these plaintiff organizations lack standing because their allegations of "a general reluctance to enter into contracts with professional solicitors" fail to state a "case or controversy." Brief in Support of Defendant's Motion to Dismiss at 4.

Despite not being directly subject to sanctions under the Statute, for at least two reasons the plaintiff organizations set out valid "cases or controversies" in their complaint. First, the organizations expressly allege that the Statute has interfered with specific, existing contracts they have with professional solicitors. Such an allegation of contractual interference is adequate to show "both threatened and actual injury as a result of the statute." *See, e.g., Secretary of State of Maryland v. Joseph A. Munson Co.,* 467 U.S. 947, 954–55, 104 S.Ct. 2839, 2845–46, 81 L.Ed.2d 786 (1984). Second, although the Statute only allows the imposition of sanctions on professional solicitors themselves, it authorizes the enjoinment of contracts between charitable organizations and professional solicitors if the challenged disclosure provisions of the Statute are not adhered to, *see* Ind.Code § 23–7–8–8(c)—making the "threatened ... injury as a result of the statute" even more direct and concrete.

Furthermore, as with Mr. Armstrong, the court finds that the plaintiff organizations' direct interest in seeing the provisions of the Statute struck down suggests that they are well-positioned "satisfactorily to frame" the overbreadth issue for the court on behalf of those parties whose conduct is allegedly chilled by the Statute. Therefore, the defendant's motion to dismiss the complaints of the Indiana Volunteer Firemen's Association and of the Professional Firefighters' Union of Indiana is denied.

**c.  *The Plaintiff Daniel L. Yuska***

■ Daniel Yuska is a resident of Indiana who "depend[s] upon publications and telephone solicitations for and on behalf of civic and charitable-type organizations to learn of their existence and their causes." Plaintiff's Reply, Exhibit E. Mr. Yuska alleges that, due to the Statute, he will be denied those charitable solicitations he desires to receive. Despite alleging a conceivable injury,[7] Mr. Yuska's complaint

---

**6.** Some commentators have suggested that in *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court "implied that the overbreadth doctrine may be employed *only* if the contested regulation violates the rights of those not before the Court." *See, e.g.,* L. Tribe, *American Constitutional Law* § 13–27 at 1023, n. 7 (2d Ed.1988) (emphasis in original.). This court, however, rejects that characterization of *Vincent* in light of the *Vincent* Court's primary finding that "[a]ppellees have simply failed to demonstrate a realistic danger that the ordinance will significantly compromise recognized

First Amendment protections of individuals not before the Court," *id.* 466 U.S. at 802, 104 S.Ct. at 2127, and in light of the further fact that such an interpretation would be contradictory to the Court's explicit recognition of the fundamental societal interest involved in having overbroad statutes competently challenged. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2846, 81 L.Ed. 2d 786 (1984).

**7.** "The Supreme Court has repeatedly recognized that the members of an audience (or putative audience) have a First Amendment interest

fails to state a "case or controversy" in the constitutional sense because the harm he alleges is undifferentiated from the harm that will be shared equally by all residents of the state of Indiana. *See Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974) (stating that "standing to sue may not be predicated upon an interest ... which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."). Even if Mr. Yuska's complaint were found to state a "case or controversy," the undifferentiated nature of his alleged injury would warrant denial of his standing on the prudential grounds that he might therefore be inadequately equipped properly to frame the overbreadth issue on behalf of those parties not appearing in this case. This decision on prudential grounds would be bolstered by the fact that there is presently before the court three other plaintiffs whom the court has found *would* properly frame those issues. See § II.A.2.a & b, *supra*. Therefore, the defendant's motion to dismiss Mr. Yuska's complaint for lack of standing is granted.

### 3. *Eleventh Amendment Immunity and Abstention*

■ Section 23–7–8–1 of the Indiana Code defines the term "charitable organization" for purposes of the Statute as "any organization described in Section 501 of the federal Internal Revenue Code." Ind.Code § 23–7–8–1 [hereinafter "Section 1 of the Statute"]. The plaintiffs urge "that to utilize this section of the Internal Revenue Code as the basis for definition of this all-important phrase, is an unconstitutional delegation of the legislative power" in violation of the Indiana constitution. Plaintiffs' Memorandum in Support at 18. In particular, the plaintiffs cite Article III, section 1, of the Indiana constitution which declares:

> The powers of the Government are divided into three separate departments; the Legislative, the Executive ..., and the

independent of the speakers." M. Nimmer, *Freedom of Speech* § 1.02[F] at 1–20 (1984) (cit-

Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another....

Ind. Const. art III, § 1. The plaintiffs also cite Article IV, section 1, of the state constitution which proclaims:

> The Legislative authority of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives ... and no law shall be enacted, except by bill.

Ind. Const. art. IV, § 1. The main thrust of the plaintiffs' argument is that incorporation of Section 501 of the Internal Revenue Code by Section 1 of the Statute violates these constitutional provisions because "interpretation of 501 IRC rests within the power of the Department of Revenue [presumably the Internal Revenue Service] ... and not within the power of the Indiana courts," Plaintiffs' Memorandum in Support at 19, and that, therefore, the statutory provision improperly delegates to the Internal Revenue Service ("IRS") the power to determine what Indiana state law will be.

The defendant counters by asserting that this court should not even reach the merits of the plaintiffs' state law claims because the defendant is entitled to invoke the immunity granted by the eleventh amendment to the United States Constitution. Even if he is not forefended by the eleventh amendment, the defendant urges the court to abstain from deciding the plaintiffs' pendent state constitutional claim until the state courts have first had a chance to address the issues raised. Brief in Support of Defendant's Motion to Dismiss at 5–9.

It is clear that, because the defendant is a state official being sued in his official capacity and because the plaintiffs seek to enjoin the defendant from enforcing a state statute, the defendant is entitled to invoke eleventh amendment immunity. *See Ford Motor Company v. Department of Trea-*

ing authority).

*sury of Indiana,* 323 U.S. 459, 65 S.Ct.347, 89 L.Ed. 389 (1945) (finding that the eleventh amendment bars suits against state officials when "the state is the real, substantial party in interest"); *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed. 2d 15 (1963) (stating that "[t]he general rule is that a suit is against the sovereign if 'the judgment sought would ... interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act'."); *see also Shannon v. Bepko,* 684 F.Supp. 1465, 1474 (S.D.Ind. 1988); *Sheets v. Indiana Dep't of Corrections,* 656 F.Supp. 733, 736 (S.D.Ind.1986) (citing authority).

The immunity afforded by the eleventh amendment, however, is not absolute: the Supreme Court has created a limited, but highly important exception to the eleventh amendment in those cases challenging the constitutionality of a state official's action. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Pennhurst State School v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The *Ex parte Young* exception, though, is not itself without exceptions. The theory undergirding *Ex parte Young* is that a state statute enacted in violation of the federal Constitution is "void" and thus does not import to the officer "any immunity from responsibility to the supreme authority of the United States." *Id.* 209 U.S. at 160, 28 S.Ct. at 454. Because the state could not properly authorize an unconstitutional action, the official is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.* Thus, in *Ex parte Young,* the Court recognized the

need to accommodate the constitutional immunity of the states to the "supreme authority" of federal law. The Court has also recognized, however, that this need to accommodate the "supreme authority" of federal law is "wholly absent ... when a plaintiff alleges that a state official has violated *state* law." *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911 (emphasis in original). In *Pennhurst* the Supreme Court found:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* ... [is] inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106, 104 S.Ct. at 911. Therefore, under the direct holding of *Pennhurst,* the plaintiffs' request for an injunction based on the state constitution is barred by the defendant's eleventh amendment immunity.[8] Furthermore, the Seventh Circuit had declared that the reasoning of *Pennhurst* is equally applicable to requests in federal court for *declaratory* judgments based on state law. *See Watkins v. Blinzinger,* 789 F.2d 474, 484 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987). Thus, the defendant's motion to dismiss the plaintiffs' state constitutional claims on the basis of the eleventh amendment is granted.[9] Accordingly, the

**8.** The ruling in *Pennhurst* obviously does not affect those claims by the plaintiff based on the *federal* Constitution: under the authority of *Ex parte Young* those claims survive the defendant's invocation of the eleventh amendment.

**9.** The court notes that, even if it were to reach the merits of the plaintiffs' "unconstitutional delegation" argument, that claim would have to be denied. It is true, as the plaintiffs point out, that Indiana courts have interpreted their state's constitution as forbidding the Indiana General Assembly from "confer[ing] upon any body or

person the power to determine what the law shall be." *State v. Review Board of Indiana,* 230 Ind. 1, 101 N.E.2d 60 (1951). It is equally clear, however, that this rule has no bearing upon the facts of this case. When the Indiana General Assembly defined the term "charitable organization" as being "any organization described in Section 501 of the federal Internal Revenue Code," it seems obvious that it was simply engaging in a form of legislative shorthand, an attempt to avoid the tedious process of redefining a term that the General Assembly obviously

court need not decide whether to adopt the defendant's contention that the court should abstain from considering the plaintiffs' state constitutional claims.

### B. The Merits of The Plaintiffs' Claims

The court now turns to the merits of the remaining plaintiffs' surviving claims as they are presented by the parties' cross-motions for summary judgment. As was noted earlier, the plaintiffs' briefs posit three primary arguments in support of their summary judgment motion.

First, the plaintiffs urge that Indiana Code section 23-7-8-1 effects a delegation of legislative authority that is unconstitutional under the Indiana state constitution. For the reasons discussed earlier, however, consideration of such a state constitutional claim by this federal court is barred by the eleventh amendment. See § II.A.3, *supra*.

Second, the plaintiffs allege that section 23-7-8-1 violates the federal constitution by overbroadly applying the professional solicitation Statute to organizations that are non-charitable in nature. The defendant argues that the scope of section 23-7-8-1 is both rational and narrowly tailored to promote the legitimate legislative purpose underlying the Statute.

Finally, the plaintiffs contend that Indiana Code section 23-7-8-6 unconstitutionally infringes upon their first amendment right to be free from coerced speech. The defendant counters, however, that the plaintiffs' speech is not entitled to full constitutional protection and that, even if fully protected, the minimal infringement upon free speech rights that section 23-7-8-6

represents is warranted by the compelling state interest in avoiding acts of fraud by professional solicitors. Because these various arguments raise distinctly different sets of issues, the court will address each of the surviving grounds underlying the cross-motions for summary judgment separately.

### 1. *Overbreadth: Indiana Code Section 23-7-8-1's Application to Non-Charities*

The plaintiffs devote the vast bulk of their briefs to their second attack on Section 1 of the Statute: they urge that, because the statutory definition of "charitable organizations" incorporates section 501 of the federal Internal Revenue Code and thus may include within its scope some organizations not typically denominated as charitable, Section 1 violates the federal Constitution by being impermissibly overbroad. As the plaintiffs contend:

> IRC § 501 encompasses an almost infinite variety of organizations engaged in innumerable activities for myriad purposes. To lump all of these together under the definition of "charitable organization" not only defies logic, but subjects each of the organizations listed above, as well as any other organization "described in § 501 of the Internal Revenue Code" to registration and disclosure provisions [under the statute].... The definition of "charitable organization" in § 1 of the [statute] goes beyond any definition traditionally supported by logic or the law.

believed had already been adequately defined elsewhere. Such state incorporation of extant federal law has frequently been approved by both the United States Supreme Court and the Indiana state courts. *See, e.g., Standard Oil Co. of California v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); *Indiana Dep't of State Revenue v. Estate of Wallace,* 408 N.E.2d 150, 156-57 (Ind.Ct.App.1980) (approving Indiana statutory incorporation of "[e]ach transfer described in Section 2055(a) of the [federal] Internal Revenue Code"); *State v. Doane,* 262 Ind. 75, 311 N.E.2d 803, 805 (1974) (holding that "[t]here is nothing inherently unconstitutional with the Indiana legislature adopting federal statutory schemes by incorporating them in sections of state statutes. A state is constitutionally

capable of scrutinizing and approving federal legislation...."). Furthermore, such an incorporation in no way involves "delegation of legislative authority" because courts read such state statutes as merely incorporating the federal law as it existed at the time of incorporation, exclusive of any federal amendments or interpretations that may have postdated the state's incorporation. *See, e.g., Hassett v. Welch,* 303 U.S. 303, 314, 58 S.Ct. 559, 564, 82 L.Ed 858 (1938); *Estate of Wallace,* 408 N.E.2d at 157. This rule of interpretation is entirely consistent with the "shorthand" justification for allowing state incorporation of federal law and would make short shrift of the plaintiffs' "unconstitutional delegation" argument.

Plaintiffs' Memorandum in Support at 11–12. The court, however, finds this lengthy argument by the plaintiffs somewhat puzzling. Standing alone, the mere fact that a statute, which professes to apply to "charitable organizations," arguably also includes within its ambit certain non-charitable organizations means so little as to be almost constitutionally irrelevant. Most statutes are judicially tested under the highly solicitous "minimum rationality" standard, *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981), and this court is not prepared to find that it was "irrational" for the Indiana General Assembly to define "charitable organization" as "any organization described in Section 501 of the federal Internal Revenue Code"—even if Section 501 in fact "describes" some organizations that are not traditionally recognized as charitable. Indeed, because constitutional "overbreadth" analysis is *only* applicable if the challenged statute "includes within its scope activities which are protected by the First Amendment," *Hill v. City of Houston*, 764 F.2d 1156, 1161 (5th Cir.1985) (quoting J. Nowak, R. Rotunda & J. Young, *Handbook on Constitutional Law* § 722 (1978)), *aff'd* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the allegedly overexpansive scope of Section 1 of the Statute only becomes constitutionally relevant if the remainder of the Statute somehow impinges on rights otherwise protected by the consti-

tution. The plaintiffs apparently concede as much when they state that "[t]he definition [in Section 1 of the Statute], of course, is harmless and unobjectionable but for the fact that it brings these organizations within the strict requirements of the Indiana Charitable Solicitations Act, particularly Indiana Code section 23–7–8–[6]...." Plaintiffs' Reply at 4. Even this concession, however, does not go far enough because the mere fact that Section 1 brings certain organizations within the "strict scope" of section 23–7–8–6 is irrelevant unless section 23–7–8–6 itself infringes upon protected first amendment activities—a fact that is not unquestionably apparent. For example, if section 23–7–8–6 forbad all organizations defined in Section 1 of the Statute from selling "obscenity" (that is, material unprotected by the first amendment), it would be immaterial that Section 1 included within its scope certain non-charitable organizations: Section 1 would not be "overbroad" because, by definition, its arguably overextensive scope would in no way impinge upon the first amendment rights of those organizations included within its reach.[10] Thus, although it may be possible to criticize Section 1 of the Statute on certain policy grounds,[11] this court's constitutional overbreadth analysis must focus exclusively on the question of whether section 23–7–8–6 impermissibly impinges on protected first amendment activities.[12]

10. The court notes that the plaintiffs' perfunctory assertion that Section 1 of the Statute is also, "unconstitutionally vague," *see* Plaintiffs' Memorandum in Support at 14, is similarly flawed: the constitutional doctrine proscribing "vagueness"—like that proscribing overbreadth—only applies strictly to those non-criminal statutes that include within their scope activities protected by the first amendment. See, R. Rotunda, J. Nowak, & J. Young *Treatise on Constitutional Law* § 20.9 at 34 (1986) (citing authority).

11. For instance, in addition to pointing out that the Statute as written applies to many non-charitable organizations, one might also note that Section 1's incorporation of Section 501 of the Internal Revenue Code may eventually lead to considerable confusion. This is so because the meaning and scope of Section 501 will continue to evolve over time as it is interpreted and reinterpreted by the federal courts and the IRS, whereas the meaning of Section 501 for purposes of Section 1 of the state Statute is fixed as

of the date of the Statute's adoption. *See, e.g., Indiana Dep't of State Revenue v. Estate of Wallace*, 408 N.E.2d 150, 157 (Ind.Ct.App.1980) That is, after a period of time, some organizations that fall within Section 1 of the Statute will fall outside of Section 501, and vice versa, thereby destroying the "coordination and uniformity between the state and federal government" that the defendant touts as justification for Section 1's incorporation of Section 501. *See* Brief in Support of Defendant's Reply to Plaintiffs' Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment [Defendant's Brief in Support] at 4. Such policy considerations, however, are strictly within the province of the legislative branch and have no relevance to a judicial determination of constitutional "overbreadth."

12. Of course, the alleged overextensive scope of Section 1 may be one of several factors that goes into a determination of whether section

It is to that question, therefore, the court now proceeds.

### 2. Overbreadth: Indiana Code Section 23-7-8-6's Alleged Facial Violation of the First Amendment

The plaintiff's most compelling attack on the statute is their assertion that Indiana Code section 23-7-8-6 [hereinafter "Section 6 of the Statute"] burdens "the free speech of professional solicitors and charitable organizations, when engaged in contract for the solicitation of funds, ... far more substantial[ly] than is necessary to accomplish any governmental interest ascertainable as justification for its statutory scheme." Plaintiff's Memorandum in Support at 16. In other words, the plaintiffs maintain that the professional solicitation of funds for charitable organizations is an activity fully protected by the first and fourteenth amendments and that, in light of the underlying state interest, the Statute is not sufficiently narrowly tailored to justify the substantial impact the Statute has on those constitutionally protected activities. The defendant contends, however, that the Statute is "specifically tailored" to promote the compelling state interest of "prevent[ing] deceptive activity and provid[ing] the donor with information to make a reasoned decision as to the contribution." Defendant's Reply Brief at 6. Therefore, concludes the defendant, despite whatever marginal impact the Statute may have on constitutionally protected activities, it is not violative of the first or fourteenth amendments.

#### a. Recent Supreme Court Precedent

Any consideration of the question of whether Section 6 of the Statute violates the first amendment must begin with three recent United States Supreme Court cases that on their face go far toward resolving the issue. The first of these cases is *Village of Schaumburg v. Citizens for A Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), in which the court struck down on first and fourteenth amendment grounds an ordinance prohibiting on-street and door-to-door solicitations for contributions by any charitable organization not using at least 75% of its receipts for "charitable purposes." In reaching its decision, the Court first found that

> prior authorities ... clearly establish that charitable appeals for funds, on the street or door-to-door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment.

*Id.* at 632, 100 S.Ct. at 833. Furthermore, the Court found that "because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services," such solicitation was not a "variety of purely commercial speech" and was thereby entitled to the entire panoply of protections afforded by the first amendment. *Id.* Because it thus impacted on fully protected speech, the challenged ordinance was then evaluated by the Court under standard first amendment analysis, with the Court determining that the ordinance was not narrowly tailored to achieve the village's principal asserted interest: the prevention of fraud. The Court concluded that certain charities would of necessity need to expend more than 25% of the funds they collected on administrative or fundraising expenses and that such a need would not thereby render solicitations by those charities "fraudulent." That is, said the court, the prevention of fraud was only "peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests"—such as requiring charities to file financial disclosure reports and by more vigorously enforcing already existing fraud laws. *Id.* at 636-38, 100 S.Ct. at 835-37.

*Schaumburg* was applied four years later by the Court to strike down a statute

23-7-8-6 is "substantially" overbroad on its face, or merely "marginally" overbroad. This use of the plaintiffs' criticisms of Section 1 is addressed with more particularity under "The Tailoring of The Statutory Provisions," § II.B.2.c.ii, *infra*.

that directly regulated contracts between charities and professional fundraisers. *See Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). In *Munson,* the challenged statute forbade such contracts if they provided that the fundraiser would retain more than 25% of the money collected. Even though the Secretary was free to waive this limitation if such a waiver was deemed necessary, the Court found the law unconstitutional under a straightforward application of *Schaumburg.* Again, the Court rejected the state's argument that restraints on the relationship between the professional fundraiser and the charity were mere "economic regulations" free of first amendment implications. Again, the Court subjected the state's statute to exacting first amendment scrutiny. And again, the Court found that the use of a percentage-based test was not narrowly tailored to achieve the state's legitimate goal of preventing fraud.

The Court most recently revisted the charitable solicitation field only last Term. *See Riley v. National Federation of The Blind of North Carolina, Inc.*, — U.S. —, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In *Riley,* the Court examined the constitutionality of a North Carolina Act that defined the "reasonable fee" that a professional fundraiser may charge according to a three-tiered schedule.[13] More directly relevant to the case at bar, the North Carolina Act also required that "professional fundraisers [orally] disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." *Id.* 108 S.Ct. at 2676-77.[14] The Court struck down both of these provisions of the North Carolina Act. The three-tiered schedule

was stricken as the Court once again reaffirmed the clear holding of both *Schaumburg* and *Munson* that "there is no nexus between the percentage of funds retained by the fundraiser and the liklihood that the solicitation is fraudulent." *Id.* at 2675. The disclosure provision was also stricken after a finding that, like the reasonable fee provisions, it impacted upon fully protected speech and that the alleged state interest served by the disclosure provision was "not as weighty as the State assert[ed], and that the means chosen to accomplish it [were] unduly burdensome and not narrowly tailored." *Id.* at 2678.

As the defendant correctly points out, *Schaumburg* and *Munson* are not precisely applicable to the case at bar because the Indiana Statute does not involve an absolute ban on solicitations based on the percentage fee paid to the solicitor. Even *Riley's* ruling on the North Carolina Act's disclosure provision is not directly dispositive of this case because there are arguably fundamental factual distinctions between the North Carolina Act and the Indiana Statute. For instance, as the defendant points out, "[i]t is important to recognize that the *Riley* Court did not address written financial disclosures made in the course of solicitation or confirmational disclosures to be made after the prospective contributor has agreed to donate." Defendant's Reply Brief at 2. At the very least, however, these three Supreme Court cases clearly establish the analytical framework within which this court must approach the free speech questions presented by the plaintiffs' complaint: a threshold inquiry into whether the Statute impacts upon activities fully protected by the first amendment and, if this inquiry produces an affirmative finding, a secondary inquiry into

13. Under that schedule, a fee of up to 20% of receipts collected was deemed reasonable. A fee of between 20% and 35% was deemed unreasonable upon a showing that the solicitation at issue did not involve the dissemination of information or advocacy relating to public issues as directed by the hiring charity. A fee exceeding 35% was deemed unreasonable, but the fundraiser was allowed to rebut that presumption by a showing that the fee was necessary.

14. The Court also examined the constitutionality of the North Carolina Act's dictate that professional solicitors could not solicit without an approved state license. Because this facet of *Riley* has little direct relevance to the case presently before this court, however, there is no need for a detailed summary of this licensure issue or the Court's resolution of it.

whether the Statute is narrowly tailored to promote a compelling state interest.

### b. Threshold Inquiry: Does the Statute Impact Upon Activities Fully Protected by the First Amendment?

■ Although the Indiana Statute being challenged by the plaintiffs applies only to charitable solicitations for money, *Schaumburg, Munson,* and *Riley* make it clear that this court cannot treat such solicitations as being mere "commercial speech." [15] *See, e.g., Riley,* 108 S.Ct. at 2673–74 (finding that "our prior cases teach that solicitation of charitable organizations is protected speech"). This exclusion of charitable solicitations from the category of "commercial speech" by the Court is a recognition of

> the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and [of] the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money.

*Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833. As *Schaumburg* notes, for a charity whose primary goal is the gathering and disseminating of information (as opposed to the providing of money or services to the needy or some other recipient), the act of solicitation *itself* may be the organization's most important vehicle for conveying its point of view. Furthermore, the protected speech overtones of such solicitations are not altered by the fact that the solicitor is a paid professional. *See Riley,* 108 S.Ct. at 2680 (finding that "[i]t is well settled that a speaker's rights are not lost merely be-

cause compensation is received; a speaker is no less a speaker because he or she is paid to speak.") (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 265–66, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964)); *cf. Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California,* 475 U.S. 1, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986) (stating that "the constitutional guarantee of free speech serves significant societal interests wholly apart from the speaker's interest in self-expression.... By protecting those who wish to enter the marketplace of ideas from governmental attack, the First Amendment protects the public's interest in receiving information.... The identification of the speaker is not decisive in determining whether speech is protected"). Even if this court were to find that the information the Indiana Statute required professional solicitors to disclose was clearly commercial in nature, this court could not apply the lesser "commercial speech" standards to that portion of the solicitation:

> But even assuming, without deciding, that such speech in the abstract is indeed merely "commercial," we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech. Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon.... Thus, where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression. [16]

---

**15.** Such a "commercial speech/non-commercial speech" distinction is important for purposes of this case despite the fact that commercial speech is protected—albeit to a lesser degree—by the first amendment, *see Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 563–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980), because the plaintiffs' challenge to the Statute is not based on the Statute "as applied" to them, but rather is based on the "overbreadth" doctrine—and the Supreme Court has declared that "overbreadth

analysis applies weakly, if at all, in the ordinary commercial context." *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *see also San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 107 S.Ct. 2971, 2981 n. 15, 97 L.Ed.2d 427 (1987).

**16.** The impact on this "inextricably intertwined" logic of the Indiana Statute's requirement of a separate post-solicitation confirmational disclosure is discussed in § II.B.2.c.ii(c), *infra.*

*Riley,* 108 S.Ct. at 2677. *See also, Munson,* 467 U.S. at 959, 104 S.Ct. at 2848.

The conclusion that it is constitutionally irrelevant that the Indiana Statute involves *forced* speech (that is, a disclosure requirement) whereas the statute stricken in *Schaumburg* and *Munson* involved *suppression* of speech is also confirmed by *Riley:* "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley,* 108 S.Ct. at 2677 (emphasis in original). Assigning full first amendment scrutiny to instances of compelled speech as well as to instances of compelled silence has long been the constitutional rule. *See, e.g., West Virginia State Board of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (stating that the "right to speak and the right to refrain from speaking are complementary components of the broader concept 'individual freedom of mind' "); *Pacific Gas & Electric Co. v. Public Utilities Comm'n of California,* 475 U.S. 1, 106 S.Ct. 903, 909, 89 L.Ed.2d 1 (1986) (stating that the freedom not to speak "serves the same ultimate end as freedom of speech in its affirmative aspect"). Although it is perhaps true that those cases entailing such things as the affirmative act of a flag salute involved more serious infringements upon personal liberties than the disclosure requirements of the Indiana Statute, "the difference is essentially one of degree." *Wooley v. Maynard,* 430 U.S. at 715, 97 S.Ct. at 1435. Protecting professional solicitors from unjustified instances of compelled speech serves the vital public interest in avoiding undue dilution of the public information actually conveyed by such solicitations.

Furthermore, as a practical matter, the Indiana Statute's compelled disclosure requirements also impinge upon the affirmative free speech rights of charities and professional solicitors in at least three ways. First, such a provision "necessarily discriminates against small or unpopular charities, which must usually rely on professional fundraisers." *Riley,* 108 S.Ct. at 2679. Second, at least in the context of a verbal solicitation, if the disclosed percentage of the solicitor's fee displeases the potential donor, the remainder of the fundraiser's free speech will likely be cut off as the donor hangs up the phone or closes the door. *Id.* Third, by thereby reducing the amount of donations affected charities can receive, the Statute will ultimately reduce the amount of money such charities have available to pay professional solicitors in the future; in turn, this will necessarily reduce the number of solicitations that occur—and will thus effectively eliminate that amount of protected speech that is "inextricably intertwined" with those solicitations.

Finally, *Riley* makes it clear that prior Supreme Court cases requiring heightened scrutiny for statutes impacting on free speech rights "cannot be distinguished simply because they involved compelled statements of opinion while here [the court] deal[s] with compelled statements of 'fact': either form of compulsion burdens protected speech." *Riley,* 108 S.Ct. at 2678. Thus, the defendant has not suggested any distinction to this court—not the commercial/non-commercial distinction nor the compelled speech/compelled silence distinction nor the fact/opinion distinction—which would justify analyzing Indiana's content-based regulation[17] under anything less than the most exacting first amendment scrutiny.

*c.  Secondary Inquiry: Is the Statute the Least Restrictive Means of Promoting a Substantial State Interest?*

The standard that is to be applied to a content-based regulation impacting on protected speech is well-settled: "even though

---

**17.** Mandating speech that a speaker would not otherwise make by definition alters the content of that speech. *See Riley,* 108 S.Ct. at 2677. Therefore, the Indiana Statute is necessarily a "content-based regulation."

the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same purpose." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *see also, NAACP v. Alabama*, 377 U.S. 288, 307–09, 84 S.Ct. 1302, 1313–15, 12 L.Ed.2d 325 (1964). For simplicity's sake this standard is often referred to as the "least restrictive means" test. *See* R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law* § 20.10 at 37 (1986).

Under the least restrictive means test the court must first determine whether the governmental purpose underlying the Statute is "legitimate and substantial." Assuming the state's interest meets this test, the court must then look to see if the statutory provisions are narrowly tailored so as to be the least restrictive means of achieving that legitimate goal. Just how narrowly tailored the statutory provisions must be depends to some extent on how weighty the government's asserted interest proves to be. Although the Supreme Court has assiduously eschewed the terminology of "balancing" in this area, an inverse relationship appears implicit in the Court's approach toward the substantiality of the government's interest on the one hand, and the degree to which statutes impinging upon free speech must be narrowly tailored on the other: the Court "has selected a two-tiered mode of accommodation, one that implicitly balances *against* government whenever the latter's interest seems dubious or marginal, but reserves the possibility of balancing *for* government whenever its interest is clearly compelling." L. Tribe, *American Constitutional Law* § 12–33 at 1039 (2d Ed.1988) (emphasis in original); *see also Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)

(stating that "[w]here a statute does not directly abridge free speech, but—while regulating a subject within the state's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well-settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so."). Regardless of how compelling the state's interest may seem, however, the court must never forget "the First Amendment's command that government regulation of speech must be measured in minimums, not maximums." *Riley*, 108 S.Ct. at 2674.

### i. *The State Interest*

Throughout the various briefs submitted in this action, the defendant has failed to adequately articulate the "legitimate and substantial" governmental interest underlying the challenged Statute. The closest the defendant gets to setting forth such an interest is his off-hand comment that "[t]hese laws prevent deceptive activity and provide the donor with information to make a reasoned decision as to the contribution." [18] Defendant's Brief in Support at 6. In other words, the defendant alleges that the state has a substantial interest in preventing fraud by professional solicitors, which is the same governmental interest that underlay the various statutes struck down in *Schaumburg, Munson,* and *Riley.* As the Supreme Court found in those three cases, this court now finds that Indiana's "interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored exception." *Riley*, 108 S.Ct. at 2675. Yet, like the Court in *Riley*, this court also finds that the danger Indiana posits

> is not as great as it might initially appear. First, the State presumes that the charity derives no benefit from funds collected but not turned over to it. Yet

---

**18.** Although stated as two separate grounds, this statement in fact posits only a single justification for the Statute: the state desire to allow potential donors "to make a reasoned decision as to the[ir] contribution." Such a "reasoned

decision" can only be made if "deceptive activity" is curtailed—and the state's chosen means of curtailing such "deceptive activity" is forcing the solicitors to "provide the donor with [additional] information."

this is not necessarily so. For example ... where the solicitation is combined with the advocacy and dissemination of information, the charity reaps a substantial benefit from the act of solicitation itself.... Thus, a significant portion of the fundraiser's "fee" may well go toward achieving the charity's objectives even though it is not remitted to the charity in cash.[19] Second, a[ ] ... portion of the disclosure law requires professional fundraisers to disclose their professional status to potential donors, thereby giving notice that at least a portion of the money contributed will be retained.

*Id.* at 2678–79. *See also Munson,* 467 U.S. at 961, 104 S.Ct. at 2849 (stating that a fundamental finding in *Schaumburg* "was that there is no necessary connection between fraud and high solicitation and administrative costs"). With this legitimate, but not overwhelming state interest in mind, the court now turns to the question of whether the Statute's provisions are appropriately narrow relative to the state's interest.

ii. *The Tailoring of the Statutory Provisions*

Where, as here, a statute imposes a direct, content-based restriction on protected first amendment activity, and where the alleged defect in the Statute is that "the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the Statute creates an unnecessary risk of chilling free speech, the Statute is properly subject to facial attack." *Munson,* 467 U.S. at 967–68, 104 S.Ct. at 2852–53. Such an "overbreadth" challenge to a statute is allowed because "[i]t has long been recognized that the First Amendment needs breathing space," *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct.

2908, 2915, 37 L.Ed.2d 830 (1973), and that such a speech-limiting "sword of Damocles" hanging over the heads of those who might wish to engage in expression protected by the first amendment would unduly chill speech which our society wishes to promote. *See also, NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) (declaring that "[b]road prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms"). Because of the societal dedication to avoiding any unnecessary chilling of expressive activity, the Supreme Court has made it clear that, in the context of the first amendment, whenever a statute is unduly overbroad the "government *must* make use of less drastic means if it would regulate at all—*whatever* substantive reduction in efficiency a less drastic means might entail." L. Tribe, *American Constitutional Law* § 12–23 at 1037 (2d Ed.1988) (emphasis in original).

The difficult question in this area, of course, is determining precisely how overbroad a statute must be before it is subject to facial invalidation. The Supreme Court has "never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application." *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2508, 96 L.Ed. 2d 398 (1987) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 630, 93 S.Ct. 2908, 2925, 37 L.Ed.2d 830 (1973) (Brennan, J. dissenting)). The Court has been particularly reticent to resort to facial invalidation of statutes because "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine." *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916. There-

---

**19.** In another context, the *Riley* Court further explained how a charity could legitimately believe that it would derive substantial benefits from a professional solicitation contract despite the solicitor's retention of a high percentage of the solicited funds:

[T]here are several legitimate reasons why a charity might reject the state's overarching measure of a fundraising drive's legitimacy—the percent of gross receipts remitted to the

charity. For example, a charity might choose a particular type of fundraising drive, or a particular solicitor, expecting to receive a large sum as measured by total dollars rather than the percentage of dollars remitted. Or, a solicitation may be designed to sacrifice short-term gains in order to achieve long-term, collateral, or non-cash benefits.
*Riley,* 108 S.Ct. at 2675.

fore, the Court has declared that, for a statute to be stricken on overbreadth grounds, that overbreadth must be "substantial." *Id.* at 615, 93 S.Ct. at 2917. In this context, however, "substantial" is not an unambiguous, self-defining term. "What does 'substantial' mean for this purpose? It means simply that the statute reaches 'a substantial number of impermissible applications' not merely 'marginal [impermissible] applications'." M. Nimmner, *Freedom of Speech* § 4.11[B] at 4–152 (1984) (quoting *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). In other words, "substantial overbreadth" is essentially a case-by-case analysis under which the court scrutinizes the statute's apparent overbreadth, judges it "in relation to the statute's plainly legitimate sweep," *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917, and ascertains whether, in relation to that "legitimate sweep," the statute's overbreadth is "substantial" or "marginal." Obviously, in order to make such a fact-sensitive determination, the "substantial overbreadth" standard requires a court to engage in a detailed examination of the challenged Statute. Therefore, this court must now explore the precise provisions of the contested Indiana Statute.

*(a) Indiana Code § 23–7–8–6(a)(1) & (2)*

■ Although the plaintiff's various pleadings are not entirely consistent,[20] it is clear that the plaintiffs' complaint mounts an attack on section 6 of the Statute in its entirety.[21] The difficulty with such a generalized challenge to section 6, however, is that the various subparts of section 6 prescribe a multiplicity of disclosures that professional solicitors must make, each with potentially different constitutional implications. Thus, any reasoned analysis of the constitutionality of section 6 of the Statute must include a separate analysis for each subpart of section 6.

Section 6(a)(1) & (2) of the Statute requires that:

a professional solicitor subject to registration under this [statute], shall disclose at the time of the solicitation and before the donor agrees to make a contribution:

(1) The charitable organization that is being represented; [and]

(2) The fact that the person soliciting the contribution is, or is employed by, a professional fundraiser consultant or professional solicitor, and the fact that the professional fundraiser consultant or professional solicitor is compensated. . . .

Ind.Code § 23–7–8–6(a)(1) & (2). In footnote 11 of the *Riley* opinion, the Supreme Court seemed squarely to address the constitutionality of disclosure provisions such as those required by section 6(a)(1) & (2). The *Riley* Court expressly stated that "nothing in this opinion should be taken to suggest that the State may not require a fundraiser to disclose unambiguously his or her professional status. On the contrary, such a narrowly tailored requirement would withstand First Amendment scrutiny." *Riley*, 108 S.Ct. at 2679 n. 11. This suggestion by the Court in *Riley* flows directly from its suggestion four years earlier in *Munson* that the state's legitimate concerns about unscrupulous professional solicitors could be accommodated directly through certain disclosure and registration requirements. *Munson*, 104 S.Ct. at 2853 n. 16.

The plaintiffs urge, however, that this court should ignore the Supreme Court's pronouncement in footnote 11 of *Riley* because that statement about the constitutionality of a requirement that solicitors disclose their professional status is mere *dicta.* Plaintiff's Memorandum of Supplemental Authority at 2. The plaintiffs also urge the court to adopt the reasoning of Justice Scalia's concurrence in *Riley*, an opinion which joined with the majority's in its entirety, excepting only footnote 11.

---

**20.** For instance, in one brief the plaintiffs urge the unconstitutionality of section 6(a)(3) of the Statute, and refer to "the balance of the provisions contained in § [6], which plaintiffs are not disturbing." Plaintiffs' Memorandum in Support at 16. Yet, in a subsequent brief, the plain-

tiffs expressly question the constitutionality of sections 6(a)(1) & (2) and 6(b) of the Statute. Plaintiffs' Memorandum of Supplemental Authority at 2–3.

**21.** *See* note 2, *supra.*

The court is not convinced. Although it is true that footnote 11 is technically "mere *dicta,*" it is equally true that "there is *dicta,* and then there is *dicta*"—that is, not all *"dicta"* is created equal. Courts have long recognized in a variety of contexts that, in the absence of directly contradictory precedent, carefully considered *dicta* can have persuasive force. *See, e.g., Rocky Mountain Fire & Casualty Co. v. Dairyland Ins. Co.,* 452 F.2d 603, 603–04 (9th Cir.1971) (per curium) (holding that "[a] federal court exercising diversity jurisdiction is bound to follow the considered *dicta* ... of state court decisions"); *Hardy Salt Co. v. Southern Pacific Transportation Co.,* 501 F.2d 1156, 1163 (10th Cir. 1974); *Hartford Accident & Indemnity Co. v. First Nat'l Bank & Trust Co.,* 287 F.2d 69, 73 (10th Cir.1961). In *Riley,* a majority of the Court clearly and unequivocally declared that a statutory disclosure provision which required professional solicitors merely to reveal the fact of their professional status was tailored narrowly enough under the first amendment to promote the state's interest in preventing fraud. Furthermore, this statement was obviously considered carefully enough by the Court that one Justice decided to dissent solely from footnote 11. This court finds, therefore, that it is bound by the Supreme Court's pronouncement in footnote 11 of the *Riley* opinion and that, by virtue of that holding, the Indiana Statute's section 6(a)(1) & (2) is plainly constitutional. This analysis is not altered by the plaintiffs' reference to Justice Scalia's lone concurrence in *Riley.* This trial court is bound to follow the clear mandate of the Supreme Court's majority, even if the logic of a concurring opinion might arguably be more persuasive in the abstract.

### (b) Indiana Code § 23–7–8–6(a)(3)

■■ Section 6(a)(3) is the part of the Statute most nearly analogous to those provisions of the North Carolina statute directly addressed by the Supreme Court in *Riley.* Under 6(a)(3) a professional solicitor engaging in a subdivision (1) solicitation [22] is required to:

disclose at the time of the solicitation and before the donor agrees to make a contribution: ...

(3) ... the percentage of charitable contributions which are to be received by the charitable organization or the fee or compensation received by the consultant and the charitable organization under the contract with the charitable organization.

Ind. Code § 23–7–8–6(a)(3). The North Carolina statute stricken down in *Riley* required that:

During any solicitation and before requesting or appealing either directly or indirectly for any charitable contribution a professional solicitor shall disclose to the person solicited: ...

(3) The average of the percentage of gross receipts actually paid to the persons established for a charitable purpose by the professional fund-raising counsel or professional solicitor conducting the solicitation for all charitable sales promotions conducted in this State by that professional fund-raising counsel or professional solicitor for the past 12 months, or for all completed charitable sales promotions where the professional fund-raising counsel or professional solicitor has been soliciting funds for less than 12 months.

North Carolina Gen.Stat. § 131C–16.1 (1986), *quoted in* Riley, *108 S.Ct. at 2672 n. 3.*

The *Riley* Court struck down the North Carolina statute because it found the statute was clearly not the least restrictive means of promoting the state's legitimate goal of discouraging fraud by professional

---

**22.** That is, any solicitation that involves requesting "other than as described in subdivision (2), directly or indirectly, financial assistance in any form on the representation that the financial assistance will be used for a charitable purpose." Ind. Code § 23–7–8–1(1). The distinc-

tions between subdivision (1) solicitations and subdivision (2) solicitations, and the statutory disclosure provisions that apply to subdivision (2) solicitations are discussed more thoroughly in § II.B.2.c.ii.(d) ("Indiana Code § 23–7–8–6(c)"), *infra.*

solicitors. First, the Court found that the North Carolina statute was not narrowly tailored to promote the stated public interest. Like the statute struck down in *Munson*, the *Riley* statute was based "on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Munson*, 467 U.S. at 964–67, 104 S.Ct. at 2850–52. *See Riley*, 108 S.Ct. at 2675. Even more importantly the *Riley* Court stated that the North Carolina statute

> necessarily discriminates against small or unpopular charities, which must usually rely on professional fundraisers. Campaigns with high costs and expenses carried out by professional fundraisers must make unfavorable disclosures, with the predictable result that such solicitations will prove unsuccessful. Yet the identical solicitations with its high costs and expenses, if carried out by the employees of a charity or volunteers, results in no compelled disclosure, and therefore greater success.

*Riley*, 108 S.Ct. at 2679. In addition to finding the North Carolina statute imprecisely tailored, the Supreme Court also found that, "in contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged donor misperception," *id.*, the state had available to it numerous less restrictive means of accomplishing its purpose. As an example, the Court suggested that the state itself could publish the detailed financial disclosure forms that it required professional solicitors to file. "This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id.* Alternatively, the Court suggested that "the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements."[23] *Id.* Because these suggested alternatives were more "in keeping with the First Amendment directive that government not dictate the content of

speech absent compelling necessity, and then, only by means precisely tailored," *id.*, the *Riley* Court found that the North Carolina statutory disclosure requirements were unconstitutionally overbroad.

Under this holding in *Riley*, it would appear that section 6(a)(3) of the Indiana Statute is equally and similarly flawed. Like the *Riley* statute, section 6(a)(3) is not precisely tailored. By incorporating section 501 of the federal Internal Revenue Code into its definition of "charitable organization," the Statute actually includes within its scope a large number of noncharitable organizations. *See* Ind. Code § 23–7–8–1; *see also* § II.B.1, *supra*. Like the *Riley* statute, the Indiana Statute is based on the fundamentally mistaken premise that high solicitation costs are a precise measure of fraud. And like the *Riley* statute, the Indiana Statute necessarily discriminates against those newer, smaller, or more unpopular charities that are forced to rely on professional solicitors to raise funds. Indeed, "professional solicitor" is expressly defined in the Indiana Statute as excluding from its ambit "a charitable organization or an officer, employer, member, or volunteer of a charitable organization." Ind. Code § 23–7–8–1. Thus, an Indiana charitable organization that is large enough and well-established enough to have "employees" could spend 99% of its solicited contributions on costs and expenses without being statutorily required to reveal that fact to potential donors, whereas a newer charitable organization, forced to resort to professional solicitors and thereby spending 30% of its solicited contributions on costs and expenses, would be statutorily required to reveal that fact, with a predictable concomitant diminution in funds contributed to it. Furthermore, as in *Riley*, a number of less restrictive alternatives for reducing fraud by professional solicitors are available to the state of Indiana. For instance, an unchallenged portion of the Statute requires professional solicitors annually to file detailed

---

**23.** In another context, the *Riley* Court stated that if vigorous enforcement of antifraud laws "is not the most efficient means of preventing

fraud, we reaffirm simply and emphatically that the First Amendment does not permit the state to sacrifice speech for efficiency." *Id.* at 2676.

disclosure forms with the state. *See* Ind. Code § 23–7–8–2. The state itself could publish this information, thereby communicating the desired information to the public without unnecessarily burdening the solicitor with coerced speech during the course of solicitation. Moreover, Indiana has other existing laws dealing with consumer protection and the prevention of fraud. *See* Ind. Code §§ 35–43–5–3 & 24–5–0.5–1 to –10. The court presumes that law enforcement officers are ready and able to vigorously enforce these alternative statutes.

Following the logic of *Riley*, therefore, it would appear that section 6(a)(3) of the Statute must be declared unconstitutional and its enforcement enjoined. The defendant urges, however, that this court should find *Riley* nondispositive of the case at bar because of several crucial factual distinctions between the stricken North Carolina statute and section 6(a)(3).

First, the defendant notes that the Indiana Statute requires that disclosures made during non-telephone solicitations be in writing, whereas the *Riley* statute apparently required all disclosures to be made orally. *See* Defendant's Reply Brief at 2; *see also* Ind. Code § 23–7–8–6(b). This factual distinction, however, lacks constitutional significance for the simple reason that, if anything, a coerced written disclosure during the course of an oral solicitation is going to be even more disruptive, even more antithetical to a continued solicitation, than would be the oral disclosure required by North Carolina—and coerced speech is certainly not any less repugnant simply because it is written rather than spoken. *See, e.g., Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

Second, the defendant argues that *Riley* is distinguishable from the present case because the North Carolina statute required solicitors to disclose their gross receipt "track record," whereas the Indiana Statute requires solicitors to tell potential donors what percentage of their contributions will actually go to the named charity. Defendant's Reply Brief at 2–3. Although the defendant is correct in asserting that

the disclosed information under the Indiana Statute is modestly more relevant to the state's purpose than the disclosed information required under the North Carolina law, such a differing statutory requirement would have had no impact upon the Court's decision in *Riley*. The progression of cases leading up to *Riley* makes it clear that the Court's objection is not to the specific information a solicitor might have to disclose but rather to the state's "fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Munson*, 467 U.S. at 964–67, 104 S.Ct. at 2850–52. *See Riley*, 108 S.Ct. at 2675 n. 7 (stating that "[e]ven if percentages are not completely irrelevant to the question of fraud, their relationship to the question is at best tenuous, as *Schaumburg* and *Munson* demonstrate."). Indeed, the actual information the North Carolina statute required solicitors to reveal is noted only marginally by the *Riley* Court. *Riley*, 108 S.Ct. at 2679 n. 12.

Finally, the defendant contends that *Riley* does not mandate this court's decision on section 6(a)(3) because under the Indiana Statute "the professional solicitor has a choice as to whether to reveal the percentage of contributions received by the charitable organization, or the consultant's fee or compensation under the contract." Defendant's Reply Brief at 3. Again, this distinction is unpersuasive because such a choice of disclosures would still unconstitutionally discriminate against those charitable organizations whose costs and expenses were seemingly high in both absolute terms and as a percentage of the contributions received. Therefore, as to the plaintiff's challenge to section 6(a)(3), *Riley* is directly on point despite several, relatively minor factual distinctions. This court, accordingly, finds Indiana Code section 23–7–8–6(a)(3) unconstitutionally overbroad and hereby permanently enjoins its enforcement.

### (c) Indiana Code § 23–7–8–6(b)

■ The most difficult issue presented by the plaintiffs' complaint is undoubtedly their challenge to the constitutionality of

section 6(b) of the Statute. Section 6(b) commands that

> in the case of a [subdivision (1)] solicitation[24] conducted orally [that is, either in person or over the phone], a written confirmation shall be sent to each person who has contributed or pledged to contribute, within ten (10) days after that person has been solicited, or before the contribution is received by the solicitor. The disclosure must include a clear and conspicuous disclosure of the information required by subsection [6](a).

Ind. Code § 23–7–8–6(b). In light of the court's earlier finding that it is constitutional for the state to require professional solicitors to disclose the fact of their professional status "at the time of the solicitation and before the donor agrees to make a contribution," see § II.B.2.c.ii.(a) (discussing the constitutionality of Indiana Code section 23–7–8–6(a)(1) & (2)), the constitutionality of a statutory provision requiring that the same information be disclosed within ten days after the solicitation cannot be seriously contested. To the extent, however, that section 6(b) requires a post-solicitation disclosure of the same information that is unconstitutionally mandated in the pre-solicitation context under section 6(a)(3) (that is, "the percentage of charitable contributions which are to be received by the charitable organization or the fee or compensation received by the consultant and the charitable organization under the contract with the charitable organization"), a far more complicated question is presented. The plaintiffs simply assert that the logic of *Riley* is equally applicable to pre-solicitation disclosures and to post-solicitation disclosures. Plaintiff's Memorandum of Supplemental Authority at 3. Such a blithe assertion, however, ignores the intricacies of one of the fundamental presumptions underlying *Riley:* that the challenged statute must be subjected to heightened scrutiny because the coerced disclosure is "inextricably intertwined" with clearly protected speech.

A proper analysis of the constitutionality of section 6(b) necessitates that the court return to its earlier determination that the Indiana Statute impacts upon fully protected, non-commercial speech. *See* § II.B.2.b. As did the *Riley* Court, this court assumed without deciding that, in the abstract, the statutorily compelled disclosures were merely "commercial" in nature. Like *Riley* the court also found, however, that the Statute should not be judged under the more solicitous standards for commercial speech because it did

> not believe that the [coerced] speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech [that is, the informative and perhaps persuasive speech that accompanies the solicitation].... [W]here, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an enterprise would be both artificial and impractical. Therefore, [the Court] appl[ies the] test for fully protected expression.

*Riley,* 108 S.Ct. at 2677. At first blush, at least, this "inextricably intertwined" justification for subjecting the statutorily coerced disclosures (that are arguably "commercial" in nature) to the heightened scrutiny normally reserved for "non-commercial" speech is somewhat less compelling in the context of a *post*-solicitation disclosure. By definition, such a disclosure is clearly separated in time from the informative and persuasive speech that accompanies the original solicitation. Indeed, in some instances this post-solicitation disclosure might not even occur until after the contributor has actually made his or her contribution. It is tempting, therefore, to conclude that a post-solicitation disclosure is not "inextricably intertwined" with protected speech and thus should be analyzed under the less rigorous standards applicable to commercial speech.[25]

---

**24.** The statutory provision requiring written confirmation in the case of a subdivision (2)

solicitation is discussed below. See § II.B.2.c.ii.(d) ("Indiana Code § 23–7–8–6(c)").

**25.** All of this is not to say that the post-solicita-

446

The fundamental flaw in this conclusion, however, is that despite being temporally distinct, the original solicitation and the coerced post-solicitation disclosure must be considered for constitutional purposes as a "single speech" whose component parts are "inextricably intertwined." This is because the constitutional litmus test for determining whether the various component parts of a speech are "inextricably intertwined" is not composed merely of a mechanical inquiry into the chronological proximity of those various speech segments; it is constituted, rather, of a carefully discerning inquiry into the degree of impermissible impact that the lesser protected speech components have upon those portions of speech which are fully protected by the first amendment. *See, e.g., Munson,* 467 U.S. at 969, 104 S.Ct. at 2853 (declaring that "whether the statute regulates before- or after-the-fact makes little difference ... the chill on the protected activity is the same"). Thus, if post-solicitation disclosures have a substantial impact upon the protected speech of charitable solicitations it would be "artificial and impractical" to parcel out the post-solicitation disclosures for lesser protection, despite the fact that those disclosures are separated in time from the original solicitations. As the *Riley* Court notes in rejecting the dissent's suggestion that the state's regulation would have only an "indirect effect" on protected speech:

> [A]s we demonstrate, the burden here is hardly incidental to speech. Far from the completely incidental impact of, for example, a minimum wage law, a statute regulating how a speaker may speak directly affects that speech. *Here, the desired and intended effect of the statute is to encourage some forms of solicitation and discourage others.*

tion disclosure requirements of section 6(b) could withstand an attack under the more solicitous first amendment standards applied to commercial speech. *See, e.g., Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 563–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980). As noted by the court earlier, however, *see* note 15, *supra,* a finding that section 6(b) involves only "commercial" speech *would* be fatal to the plaintiffs'

*Riley,* 100 S.Ct. at 2673 n. 5 (emphasis added). Likewise, the "desired and intended effect" of section 6(b) is undeniably the encouragement of some forms of solicitation and the discouragement of others—and the impact of such post-solicitation disclosures on initial charitable solicitations (which *Schaumburg, Munson,* and *Riley* make clear are fully protected by the first amendment) is both direct and substantial. Section 6(b) disclosures will undoubtedly discourage persons from contributing to certain affected charities—indeed, that is the entire purpose underlying the choice of a disclosure requirement as the means of discouraging fraud. Those persons who have pledged but not yet contributed will be encouraged to withhold their contributions; those persons who have already contributed will be encouraged to demand a refund or to refuse future contributions. This reduction in contributions to certain charities will of necessity mean that those charities will have less funds with which to hire professional solicitors, directly and even considerably reducing the amount (or quality) of charitable solicitations that such charities can conduct. At the same time, realizing that certain charities required to reveal high solicitation costs to donors will garner less contributions for an equal amount of work, professional solicitors will be encouraged to work for charities with low costs and expenses and discouraged from working for charities with high costs and expenses. *See Riley,* 108 S.Ct. at 2679 (noting that "the predictable result is that professional fundraisers will be encouraged to quit the state or refrain from engaging in solicitations that result in an unfavorable disclosure").

In all of these ways, a post-solicitation disclosure requirement inevitably, substantially, and impermissibly discourages the

"overbreadth" attack in view of the Supreme Court's declaration that "overbreadth analysis applies weakly, if at all, in the ordinary commercial context." *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed. 2d 810 (1977); *see also San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 107 S.Ct. 2971, 2981 n. 15, 97 L.Ed.2d 427 (1987).

fully protected speech of those charities that are newer or lesser well known—and all based on the "fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Munson,* 467 U.S. at 964–67, 104 S.Ct. at 2850–52. Therefore, because of its substantial and inevitable impact on the fully protected speech of charitable solicitations, the court finds that the compelled disclosures of section 6(b) are "inextricably intertwined" with such protected speech and are thereby subject to the heightened scrutiny always accorded content-based regulations of speech.

Having determined that section 6(b) is to be tested under exacting first amendment standards, the remainder of the court's analysis is relatively straightforward in light of the court's prior determination that the fee disclosure provisions of section 6(a)(3) are unconstitutionally overbroad. *See* § II.B.2.c.ii.(b), *supra.* Just as with section 6(a)(3), the fee disclosure provisions of section 6(b) are not precisely tailored: they apply to non-charitable organizations through the Statute's incorporation of section 501 of the Internal Revenue Code; they are based on the fundamentally mistaken premise that high solicitation costs are a precise measure of fraud; and section 6(b) necessarily discriminates against those newer, smaller, or more unpopular charities that are forced to rely on professional solicitors. Furthermore, just as with section 6(a)(3), the state of Indiana has available to it a number of means less restrictive than section 6(b)'s post-solicitation disclosure requirements for accomplishing its goal of discouraging fraud by professional solicitors: for instance, it could publish details of the disclosure forms it requires professional solicitors to file annually with the state, or it could more vigorously enforce its already existing anti-fraud statutes.

Therefore, the court finds that that portion of section 6(b) requiring professional solicitors to send to donors a post-solicitation, written confirmation of the solicitor's professional status is constitutional for the reasons elaborated in § II.B.2.c.ii. (a), *supra.* To the extent, however, that section 6(b) requires a post-solicitation disclosure of the professional solicitor's fee arrangement with the represented charity, the court finds that Indiana Code section 23–7–8–6(b) is unconstitutionally overbroad and hereby permanently enjoins its enforcement.

### (d) Indiana Code § 23-7-8-6(c)

Section 6(c) of the Statute is simply a mirror image of section 6(b); it merely imposes upon subdivision (2) solicitations precisely the same post-solicitation disclosure requirements that section 6(b) imposes upon subdivision (1) solicitations. Section 6(c) provides:

> A written confirmation made by a person who solicits under subdivision (2) of the definition of "solicit" ... must disclose the information required by subsection [6](a)(1) and [6](a)(2) and the percentage of charitable contributions that are to be received by the charitable organization or the fee or compensation received by the consultant and the charitable organization under the contract with the charitable organization.

Ind. Code § 23–7–8–6(c). Because the parties have not presented (nor has the court independently discerned) any reason to differentiate between section 6(c) and section 6(b) for constitutional purposes, the results of this court's overbreadth analysis of section 6(c) are compelled by the reasoning that underlies its prior constitutional analysis of other portions of section 6 of the Statute. For the reasons set forth in § II.B.2.c.ii.(c), *supra,* the court finds that section 6(c) of the Statute must be subjected to heightened first amendment scrutiny. For the reasons set forth in § II.B.2.c.ii.(a), *supra,* the court finds that section 6(c)'s incorporation of the disclosure requirements of section 6(a)(1) & (2) is constitutionally permissible. For the reasons set forth in § II.B.2.c.ii.(b) & (c), however, the court finds that section 6(c)'s requirement of a post-solicitation disclosure of the professional solicitor's fee arrangement with the represented charity is unconstitutionally overbroad and hereby permanently enjoins enforcement of that portion of Indiana Code section 23–7–8–6(c).

448

### 3. *Severability*

■ The sole remaining question for the court is whether the unconstitutional portions of section 6 can be severed from the remainder of the Statute, or whether the entire Statute must be stricken as unconstitutional.[26] It is the well-established rule that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed. 2d 394 (1985). On the other hand an unconstitutional provision in a statute may not be severed if that provision is an integral part of the statutory enactment when viewed in its entirety, *Zbaraz v. Hartigan*, 763 F.2d 1532 (7th Cir.1985), or if such severance would result in the creation of a law that the legislature would not have enacted. *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir.1984).

■ A reading of the Statute in its entirety clearly indicates that section 6 is a relatively peripheral part of the Statute. The primary thrust of the Statute is plainly the registration procedures set up in Indiana Code section 23–7–8–2—a fact that is emphasized by the Statute's title: "Professional Fundraiser Consultant and Solicitor Registration." Thus, it is obvious that the Indiana legislature would have enacted the registration Statute even without the disclosure requirements of section 6.[27] Furthermore, it is equally apparent that section 6(a)(3) (and those portions of sections 6(b) and (c) that require the post-solicitation disclosure of the same information required in section 6(a)(3)) is entirely severable from the remainder of section 6. As the defendant points out:

> the disclosure requirement found in subsection (a)(3) is merely one of the matters that has to be revealed in the context of solicitations. Subsection (a)(3) is not inseparably connected to the other provi-

sions. Subsections (a)(1) and (2) provide important and relevant information to prospective donors without reference to subsection (a)(3). Should subsection (a)(3) be excised, the remainder of the statute would further the legislative objectives.... Deleting this subsection would not destroy the effectiveness of the provision. Compliance with subsection (a)(1) and (2) would be required, and the relevant information would be provided to prospective contributors.... [T]he legislature would have enacted Ind. Code § 23–7–8–6 (Supp.1987) without subsection (a)(3).

Defendant's Reply Brief at 11–12. Moreover, the plaintiffs apparently do not question the severability of the challenged portions of the Statute. *See* Plaintiffs' Memorandum of Supplemental Authority at 5. Therefore, the court finds that those portions of the Statute declared unconstitutional (that is, section 6(a)(3) and those parts of sections 6(b) and 6(c) that require disclosure of the professional solicitor's fee arrangements) are entirely severable from the Statute as a whole, and the remainder of the Statute is unaffected by this decision.

### III. *Conclusion*

The defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART and the parties' cross-motions for summary judgment are each GRANTED IN PART and DENIED IN PART.

Because the plaintiffs allege that the challenged Statute is presently chilling protected speech, the defendant's motion to dismiss the plaintiffs' claims as not yet being ripe for adjudication is DENIED. Because the court finds that the plaintiffs Percy M. Armstrong, Indiana Volunteer Firemen's Association, and Professional Firefighters' Union of Indiana all present actual "cases or controversies" in their complaints and because the court further

---

**26.** The statute's lack of an express severance clause is not dispositive of this question, particularly in light of the fact that the Indiana Code contains a general severance clause. Ind. Code § 1–1–1–8(a).

**27.** Indeed, Section 6 as it is challenged by the plaintiffs was only added to the Statute by way of amendment four years after the Statute's original enactment. *Compare* Ind. Code Ann. § 23–7–8–1 to –8 (Burns 1984) *with* Ind. Code Ann. § 23–7–8–1 to –9 (Burns Supp.1988).

finds that those plaintiffs would satisfactorily frame the overbreadth issues on behalf of those affected parties not before the court, the defendant's motion to dismiss the complaints of those plaintiffs on the basis of standing is DENIED. Because plaintiff Daniel L. Yuska's allegation of generalized and undifferentiated harm fails to meet the constitution's minimal "case or controversy" requirement, the defendant's motion to dismiss his complaint on the basis of standing is GRANTED. Because the defendant is entitled to the full protection of the eleventh amendment against an allegation in federal court that he is violating state law, the defendant's motion to dismiss the plaintiffs' state constitutional claims on the grounds of state immunity is GRANTED. The court does not reach the defendant's assertion that the court should abstain from considering the plaintiffs' state law claims.

Because the incorporation of Internal Revenue Code section 501 by Indiana Code section 23–7–8–1 is only subject to "overbreadth" analysis if the remainder of the challenged Statute somehow impacts upon protected first amendment activity, the plaintiffs' claim that, even standing by itself, section 1 of the Statute is impermissibly overbroad is DENIED. Because the Supreme Court made clear in its *Riley* opinion that disclosure requirements such as those contained in section 6(a)(1) & (2) of the Statute would be permissible, the plaintiffs' overbreadth challenge to Indiana Code section 23–7–8–6(a)(1) & (2) is DENIED. Because section 6(a)(3) of the Statute is not significantly distinguishable from the statute stricken down by the Supreme Court in *Riley*, the plaintiffs' motion for summary judgment on their overbreadth challenge to Indiana Code section 23–7–8–6(a)(3) is GRANTED. Because the Statute's post-solicitation disclosure requirement is "inextricably intertwined" with fully protected speech and because the Statute's post-solicitation, fee-arrangement disclosure requirement is not narrowly tailored to promote a compelling state interest, the plaintiffs' motion for summary judgment on their overbreadth challenge to Indiana Code section 23–7–8–6(b) is

GRANTED to the extent that that section requires disclosure of the professional solicitor's fee arrangements. Because the requirements of section 6(c) of the Statute are constitutionally indistinguishable from the requirements of section 6(b), the plaintiffs' motion for summary judgment on their constitutional challenge to Indiana Code section 23–7–8–6(c) is GRANTED for the same reasons and to the same extent that their motion with respect to section 6(b) is granted.

It is so ORDERED.